Receipt number AUSFCC-10155889

**IN THE UNITED STATES
COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| K2 SOLUTIONS, INC., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Case No.** **25-133 C** |
| | ) |
| THE UNITED STATES, | ) |
| Defendant. | ) |

**COMPLAINT**

Plaintiff, K2 Solutions, Inc. ("K2"), by and through its undersigned counsel, hereby files this Complaint against Defendant, the United States of America, acting by and through the United States Postal Service, and alleges as follows:

**NATURE OF ACTION**

1. This action concerns the United States Postal Service's ("USPS") Third-Party Canine-Cargo ("3PK9-C") Program, which is intended to further national security interests by procuring the services of third-party explosives detection canine contractors to augment air cargo screening capabilities at airports around the country and its territories. K2 appeals the USPS's bad faith January 24, 2024, default termination ("Termination Notice") of its contract under the program ("Contract").

2. The USPS's termination purports to have arisen out of "K2's demonstrated performance failures" and its "inability to correct such failures." This allegation is a work of fiction. K2 had an overall rate of 99.95% for on-time, compliant mail screening during performance. Moreover, K2, through great effort, complied with the Contract requirements despite the USPS's wholesale lack of cooperation and its failure to discharge its duties under the Contract, including 16 months of USPS-driven communication and administration failures and, as found by

the Court of Federal Claims[1] in one of the numerous procurement-related protests, improper contract management. The USPS's course of conduct was intended to, and did, frustrate K2's ability to perform its obligations under the Contract.

3.      Before its wrongful termination of the Contract, the USPS issued a highly selective Corrective Action Demand and Cure Notice, both of which were devoid of context, much less contained any acknowledgment of K2's overall performance success, but to which K2 nevertheless successfully responded. Indeed, K2 was so successful that the USPS never raised any concerns regarding performance after accepting K2's Cure Notice response.

4.      In the Termination Notice, the USPS merely repeated the same issues alleged in the Corrective Action Demand and Cure Notice which K2 had already addressed and the USPS had already accepted.[2] The "new" issues set forth in the Termination Notice were never raised by the USPS during the self-described probationary period following the USPS's acceptance of K2's Cure Notice response. The USPS's silence is telling.

5.      The Termination Notice is nothing more than a bad faith sleight of hand. It largely relies on new characterizations of prior issues that the USPS has carefully edited from those stated in its original documentation and baldly omits inconvenient issues where K2 proved the USPS was wrong. This patently self-serving conduct cannot be explained as anything other than a baseless termination intended to malign and harm K2. The termination for default was clearly pretextual, has no fidelity, and is not credible. It must be overturned.

---

[1] *See Glob. K9 Prot. Grp., LLC v. United States*, 170 Fed. Cl. 523, 530-31 (2024). A true and accurate copy of the Court's Opinion and Order is attached hereto as **Exhibit 1**.

[2] *See Glob. K9 Prot. Grp., LLC vs. United States*, Case No. 1:23-cv-00210-RTH, ECF 125-16, at 2 (Fed. Cl. 2023) ("Joint Status Report") (the USPS is "accepting K2's proposed plan to remedy its performance. This plan will be implemented on its existing sites."). A true and accurate copy of the Joint Status Report is attached hereto as **Exhibit 2**.

6.      The USPS never intended to utilize K2 long term, preferring instead to continue working with its original awardee and preferred contractor, Michael Stapleton Associates ("MSA"). In fact, the USPS continued to work with MSA long after the Court of Federal Claims disqualified it from performance due to the Court's finding of an unmitigable conflict of interest, which MSA appealed to the United States Court of Appeals for the Federal Circuit. In furtherance of retaining MSA for as long as possible subsequent to the Court's disqualification of MSA and pending its appeal, the USPS modified the Contract and re-sequenced the roll-out schedule (shifting the International Cluster, the first and most lucrative group of airports scheduled to be taken over by a new provider – K2 – from first to last, thus delaying the transition from MSA to K2 by several months). The USPS never worked with (nor intended to work with) K2 in good faith to enable K2 to succeed. The USPS's termination had nothing to do with K2's performance.

7.      The Court need not take K2's word to arrive at the same conclusion. Before terminating K2 for default, the USPS offered K2 a mutual, no-cost walk away to avoid paying settlement costs and because it knew a default termination would not stand up under minimal scrutiny, which K2 rightly declined. Then, after terminating K2 for default, the USPS retained K2's services for an additional four months. If K2's performance was so deficient that a default termination was necessary, the USPS would not have offered a no-cost walk away and it certainly would not have retained K2's performance for several months afterwards given the obvious national security importance of the Contract. In fact, this action alone dispels any credible basis for defaulting K2 on alleged performance issues. The USPS's own conduct confirms that it grossly abused its termination discretion.

## PARTIES

8.      Plaintiff, K2, is a North Carolina corporation with its principal place of business located at 5735 U.S. Highway 1, Southern Pines, North Carolina 28387.

9.      The Defendant is the United States, acting by and through the USPS.

## JURISDICTION

10.      This action is an appeal from the USPS's January 24, 2024, final decision terminating the Contract for default. The USPS's termination was made in bad faith and amounts to a breach of the Contract.

11.      This Court has jurisdiction over this matter under the Tucker Act, 28 U.S.C. § 1491, which confers jurisdiction on this Court over claims arising under the Contract Disputes Act of 1978 ("CDA"). *See* 28 U.S.C. § 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [the CDA], . . . on which a decision of the contracting officer has been issued under section 6 of" the CDA).

12.      The CDA authorizes "a contractor to bring an action directly on [a] claim in" this Court within 12 months of a contracting officer's final decision. 41 U.S.C. § 7104(b)(1), (3). As K2's Complaint has been timely filed within 12 months of the USPS's January 24, 2024, final decision, the Court has jurisdiction over this action.

## FACTUAL BACKGROUND

### A.      The Third-Party Canine-Cargo Program

13.      After the attacks on the United States on September 11, 2001, Congress mandated that the Administrator of the Transportation Security Administration ("TSA") shall provide for the screening of all passengers and property – including United States mail, cargo, carry-on and

checked baggage, and other articles – that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation (49 U.S.C. § 44901(a)).

14.     Subsequently, the Implementing Recommendations of the 9/11 Commission Act of 2007 amended 49 U.S.C. § 44901 to require the establishment of a system to screen 100 percent of cargo transported on passenger aircraft to ensure the security of all such passenger aircraft carrying cargo (49 U.S.C. § 44901(g)(1)).

15.     In defining "screening," the statute specifically includes the use of explosives detection canine teams certified by the TSA.

16.     The TSA issued the Certified Cargo Screening Program ("CCSP") regulation in 2009, codified at 49 C.F.R. part 1549, to provide an approved method for TSA-regulated entities to screen 100 percent of all cargo to be transported on passenger aircraft.

17.     The CCSP established a new regulatory framework that allows a third-party to screen cargo to TSA standards, relieving the air carrier of the costs, resources, and time constraints associated with screening cargo on airport grounds.

18.     Section 1941 of the FAA Reauthorization Act of 2018 directed TSA to develop and issue standards for the use of third-party explosives detection canine assets for the primary screening of air cargo.

19.     TSA established the Third-Party Canine-Cargo Program under the CCSP to enhance the screening of air cargo by leveraging the capabilities of third-party explosives detection canine teams.

20.     The 3PK9-C program was intended to provide an efficient and effective method for screening air cargo to TSA's standards. Under this program, third-party canine teams trained in

explosives detection can be certified by a nongovernmental entity ("3PK9-C Certifier"), acting under the approval of TSA, as meeting TSA's certification standards.

21.     Canine team providers can become Certified Cargo Screening Facilities-Canine ("CCSF-K9") and enter into agreements with TSA-regulated entities to screen cargo in a manner that meets TSA's cargo screening requirements.

22.     The Aircraft Operator Standard Security Program ("AOSSP") is the governing document regarding aircraft operator security. The TSA developed the AOSSP to comply with laws and regulations affecting aircraft security. The TSA issued amendments to the AOSSP that required all outbound mail originating domestically and flying onboard passenger planes with international destinations to be screened as of June 30, 2021. Currently, the USPS International mail is exclusively transported by domestic and international passenger carriers.

23.     The Contract required CCSF-K9 supplier(s) to provide TSA-approved 3PK9-C explosives detection canine teams to screen Priority Mail and mail weighing 16 ounces or greater transported on domestic and international passenger commercial air carriers on a nationwide basis.

24.     The Contract also required suppliers to have the capability for 3PK9-C teams to be dispatched to any U.S. location or territory at the request of the United States Postal Inspection Service ("USPIS") (including Alaska, Hawaii, Guam, U.S. Virgin Islands and Puerto Rico) for investigative and preventative responses.

**B.      The Procurement**

**1.      The USPS's Conduct Prior to Awarding the Contract to K2**

25.     The predecessor contract was originally awarded, in its entirety, to MSA in November 2020 following a pilot program that was developed and managed by MSA in 2019.

26.     Several pre- and post-award protests followed the 2020 solicitation and subsequent award to MSA alleging, *inter alia*, that the requirements were solicited in a way that distinctly benefited MSA and that MSA had unfair competitive advantages due to organizational conflicts of interest.

27.     The Court of Federal Claims remanded twice, and on February 18, 2022, after the second remand, the USPS took corrective action to mitigate MSA's OCI by shortening MSA's contract by one year and cancelling all renewal options for the contract. The USPS also issued two new solicitations, one for Canine Screening and the other for Alarm Resolution (collectively, the "re-solicitation").[3]

28.     On September 2, 2022, the USPS issued awards to MSA, American K9 Detection Services ("AMK9") and K2. K2 was awarded the Central East Cluster and the International Cluster (a total of 10 sites), AMK9 was awarded the Central South Cluster and Northeast Cluster (a total of 10 sites), and MSA was awarded the Northwest, Southeast, Southwest, Mid-Atlantic and Central North Clusters (a total of 28 sites).

29.     On January 31, 2023, the Court of Federal Claims determined that MSA's OCI was immitigable and disqualified MSA from the 2022 re-solicitation, frustrating the USPS's efforts to continue utilizing its preferred provider for the lion's share of the work.

30.     On February 6, 2023, the USPS conducted a new best value decision for each Cluster and awarded K2 the Southwest, Central North and Northwest Clusters (18 additional sites) and AMK9 the Mid-Atlantic and Southeast Clusters (12 additional sites).

31.     While the redistribution of MSA's awards appeared to comport with the Court of Federal Claims' Order, the injunction disqualifying MSA was largely ignored by the USPS. In

---

[3] This Complaint relates to the Canine Screening work only.

fact, the USPS went to great lengths to extend MSA's performance in spite of the court's mandate, and its efforts were not unavailing. Delays in transition orchestrated by the USPS, including its resequencing of the roll-out schedule, allowed MSA to continue its screening services in direct violation of the court's order and injunction.

### 2. The USPS's Award of the Contract to K2

32.     On Friday, September 2, 2022, at 8:05 pm, the USPS sent an email notifying K2 of award with a copy of the Contract No. 2BEMPS22-B-0145, a services contract for TSA-approved 3PK9-C Mail Screening Services at various locations across the United States, attached.

33.     The Contract was issued as a multiple-award Indefinite Quantity/Indefinite Delivery vehicle under which successful contractors were awarded geographic "clusters" comprised of airport locations at which they were to provide 3PK9-C services.

34.     The USPS initially awarded the "International" and "Central East" clusters to K2, the former of which was the first of nine clusters scheduled to roll out, just five weeks post-award, although additional clusters, as noted, were awarded to K2 after MSA's disqualification.

### 3. The USPS's Abject Failure to Cooperate with K2 and Comply with Its Contractual Obligations from Contract Award

35.     The roll-out schedule incorporated by the Contract listed the performance start date for the first location in the first cluster (the International Cluster or "INL") as July 7, 2022 – almost two months before the contract award date.

36.     The schedule was caveated with the heading: "The following dates are no longer relevant and this attachment acts as a placeholder and will be replaced with an updated spreadsheet with updated dates."[4]

---

[4] A true and correct copy of the Roll-Out Schedule is attached hereto as **Exhibit 3**.

37.     The award was issued after hours on Friday, September 2, 2022, which was the Labor Day weekend. Despite failing to provide a material portion of the Contract – the actual schedule itself – the USPS began to pressure K2 into returning an executed contract on Tuesday, September 6, the following business day.

38.     On September 7, the USPS sent a second, more strongly worded email (to K2's business development unit) requiring that the signed Contract be returned by 5:00 pm ET that day.[5]

39.     K2 executed and returned the Contract as directed and immediately ramped up recruiting and course selection for the 55 handlers needed to permanently serve the four airport locations within the International Cluster (John F. Kennedy ("JFK"), Miami ("MIA"), Orlando ("ORD"), and Los Angeles ("LAX")).

40.     In the days and weeks following execution of the Contract, communications from the USPS contracting office went radio silent.

41.     Between September 12, 2022, and September 27, 2022, Lane Kjellsen, K2's Chairman and CEO, made several phone calls and sent at least four separate emails to the USPS contracting office requesting a kick-off meeting.[6]

42.     All of Mr. Kjellsen's communications went unanswered except his September 26, 2022, email, to which the USPS contracting office response indicated only that the roll-out schedule was "still being finalized."[7]

---

[5] *See* email correspondence dated September 7, 2022, from Russell Jacobs to Amanda Begins. A true and correct copy of this email correspondence is attached hereto as **Exhibit 4**.

[6] *See* email correspondence date September 26, 2022, from Lane Kjellsen to the USPS contracting office. A true and correct copy of this email correspondence is attached hereto as **Exhibit 5**.

[7] *See* email correspondence dated September 26, 2022, from Russell Jacobs to Lane Kjellsen. A true and correct copy of this email correspondence is attached hereto as **Exhibit 6**.

43.     Also on September 26, 2022, Mr. Kjellsen sent an email to Linda Flynn, the USPS Contracting Officer's Representative ("COR"), introducing her, for a second time, to Charity Storey, K2's licensing and badging coordinator, in an effort to facilitate communication regarding airport badging contacts and the sponsorship letters needed from the USPIS to initiate background checks for personnel badging and airport access.

44.     In the September 26, 2022, email, Mr. Kjellsen also noted the lack of communication from the USPS contracting office regarding his requests for a kick-off meeting.[8]

45.     The following day, on September 27, 2022, Mr. Kjellsen sent yet another email to the contracting office, which stated:

> Hi Russell,
>
> Following up again regarding Kick Off and Roll Out schedule for USPS contract award dated September 2.
>
> I apologize but I have to express my frustration at the lack of communication and planning. We are trying hard to plan our transition in for performance, but now, 25 days post award, we have no information.
>
> As stated below we are recruiting and hiring, but we have no billable positions and no forecast of when we will. We are flying blind, trying to prepare, but also trying to not spend too many resources as we have no clue what work will come, in what order or when. We cannot target recruiting to match a stand up schedule because we have no information.
>
> This is costing our contract start up viability, and it is costing our company significant dollars on a daily basis. Please provide guidance as soon as possible to conserve resources needed for the contract performance and our start up expense costs.
>
> Thank you for your consideration. Best Regards,
>
> Lane[9]

---

[8] *See* email correspondence dated September 26, 2022, from Lane Kjellsen to Linda Flynn. A true and correct copy of this email correspondence is attached hereto as **Exhibit 7**.

[9] *See* Ex. 5.

46.     On September 29, 2022, the COR sent an email to Ms. Storey in response to

Mr. Kjellsen's September 26, 2022, correspondence, stating as follows:

> Good Morning Charity,
>
> SIDA badge sponsorship letters can not be given until you get you locations and dates.
>
> When you have your dates please reach out to Inspector Hawkins (copied) and he can assist in obtaining sponsorship letters.
>
> I understand you were not in the room when all of this was discussed.
> Nikia's group will be able to assist you in obtaining you Postal SISC clearances. Which all of your people will need.
>
> Please copy Troy and I on correspondence so we can redirect on issues such as this if needed. We are here to assist as needed.
>
> Thank you
>
> Linda Flynn[10]

47.     While Ms. Flynn decidedly omitted any mention of the massive scheduling change

that was underway, the following day, September 30, 2022, Russell Jacobs, a USPS Contract and

Purchasing SM Specialist, sent an email to  Amanda Begins, K2's Director of Growth, and Guy

Zahn, K2's Chief Operating Officer, with a unilateral Amendment (Amendment 001) incorporating

an updated roll-out schedule.[11] The revised schedule pushed all nine clusters to the right to account

for the delay in contract award. Additionally, absent any stated rationale or justification, the

International Cluster was completely re-sequenced; the USPS moved it from first to roll-out to

---

[10] A true and correct copy of this email correspondence is attached hereto as **Exhibit 8**.

[11] *See* email correspondence dated September 30, 2022, from Russel Jacobs to Guy Zahn. A true and correct copy of this email correspondence is attached hereto as **Exhibit 9**, and a true and correct copy of Amendment 001 is attached hereto as **Exhibit 10**.

last. Of all nine clusters, the International Cluster was the only cluster that was re-sequenced, shifting the roll-out date from mid-October 2022 to June 2023 – a delay of nearly eight months.[12]

48.     On October 11, 2022, Justin Falconer, K2's Program Manager, submitted a staffing plan – the first contractual deliverable – to the COR as required by the Contract. The staffing plan laid out in detail K2's strategy for hiring personnel, canine pairing, and training and team certification (third-party certification of the canine and handler team as a unit) to ensure all sites were adequately staffed and to afford K2 personnel sufficient time to go through the badging processes (which varied by location) before commencement of services, specifically to mitigate the risks of delay.

49.     K2's staffing plan included, *inter alia*, K2's key management and operations personnel and contact information along with a table listing K2 personnel (by employee name) slated to work each cluster, whether the team was a permanent team or a stand-up team, the name of the canine partner, and graduation/certification dates. It also included a table setting forth the number of teams K2 planned to use at each service location to fulfill the hours/days of service requirements set forth in the Contract for both the Central East and International clusters.

50.     K2's staffing plan was fully aligned with the requirements set forth in the USPS's solicitation, K2's proposal, K2's response to the USPS's post-BAFO staffing inquiry, and the Contract itself.

51.     Neither the USPIS nor the USPS called for changes or corrections to K2's staffing plan, nor did they raise any concerns regarding K2's proposed staffing levels. In fact, the COR never provided any response, despite her contractual obligation to do so.

---

[12] This significant and entirely unanticipated change resulted in substantial sunk costs associated with K2's K9 training and housing, recruiting, training, and hiring of personnel, who could not afford to wait eight months for their first paycheck.

52.     On October 31, 2022, K2 submitted its second contractual deliverable, the Task Order Management Plan. The accompanying correspondence from Mr. Falconer noted that no changes were made to the staffing plan due to the delay of a kick-off meeting and, once again, K2 requested that such a meeting be scheduled. As with the first deliverable, the COR failed to provide any feedback or even acknowledge the Task Order Management Plan, except indirectly when she forwarded the chain to the USPS contracting office because, in her words, "the kick-off meeting should be hosted by the Contracting Officers."[13]

53.     On November 18, 2022, the USPS issued its third unilateral Contract modification, Amendment 005, changing the roll-out schedule a third time.[14]

54.     On November 23, 2022, Mr. Kjellsen re-initiated his requests for a kick-off meeting[15] and followed up with the USPS on January 11, 2023.

55.     As K2 was rapidly closing in on the February 15, 2023, start date for the Central East Cluster, Meghan Whitt, K2's General Counsel, also sent numerous requests for a kick-off meeting, including on January 4, 2023, January 11, 2023, and January 17, 2023.[16]

56.     None of the USPS's responses provided substantive information and the vast majority of K2's requests were ignored altogether, confirming concerns that the USPS was

---

[13] *See* email correspondence dated October 31, 2022, between Linda Flynn and Justin Falconer. A true and correct copy of this email correspondence is attached hereto as **Exhibit 11**.

[14] A true and correct copy of Amendment 005 is attached hereto as **Exhibit 12**. Amendments 002 and 003 were never issued to K2 for reasons K2 is unaware. Amendment 004 was issued on October 31, 2022. A true and correct copy of Amendment 004 is attached hereto as **Exhibit 13**.

[15] *See* email correspondence between K2 and the USPS from November 2022 and January 2023. A true and correct copy of this email correspondence is attached hereto as **Exhibit 14**.

[16] *See id.*

intentionally taking measures to delay K2's performance. Despite dozens of requests by K2, the USPS **never** held a kick-off meeting with K2.[17]

57.    In the months leading up to the February 15, 2023, roll-out of the Central East Cluster, K2's operational team, including Mr. Falconer and Ms. Storey, held regular phone calls with the COR and other members of the USPIS Team.

58.    During those calls, K2's operational team repeatedly communicated the need for pre-site visits and coordination meetings, an essential component of logistics coordination for equipment and personnel on site (among other things). They made multiple requests for sponsorship letters from USPIS – which were needed to confirm that K2 was a USPS-contracted service provider – for K2 personnel to get badged (especially at sites requiring Security Identification Display Area ("SIDA")[18] badging) and for the cognizant airport authority to grant K2 personnel access to airport service sites. They also repeatedly asked for points of contact for the USPS's on-site personnel and cognizant airport authority personnel, which was critically important information and required for K2 handlers to get on site and badged before performance.

---

[17] A kick-off meeting between the procuring agency and the contractor(s) is contractually mandated in most cases; even where it is not, is an established and customary practice designed to cover the contract terms in sufficient detail for the parties to reach a shared understanding of requirements and expectations, to clarify any discrepancies, to raise issues or questions for the purpose of discussion and resolution, to establish an agreed upon framework for transition/start-up and performance, and so forth.

[18] SIDA badging is required for access to zones individually designated by each airport as Security Identification Display Areas, where security measures specified under 49 C.F.R. § 1542.205 are carried out. Personnel requiring access to these areas must undergo extensive background checks and the process can take anywhere from weeks to months.

59.    The USPS COR denied K2's request to conduct pre-performance site visits at locations within the Central East Cluster, as well as ***every*** request K2 made of this kind thereafter.[19] Further, the USPIS did not send sponsorship letters for the Central East Cluster locations until January 25, 2023, a mere 15 days before K2's performance start date, and those turned out to be useless, as discussed further below. With respect to K2's requests for contact information for on-site USPIS personnel and cognizant airport authority personnel, the COR either failed to send the information in a timely manner (sometimes just days before the scheduled start date), the contact information was outdated or incorrect, or the COR failed to provide it at all.

60.    The COR informed neither the cognizant airport authority nor the airlines delivering mail that K2, a new contractor at each of the five Central East Cluster locations, had been issued a contract with USPS to take over screening services for MSA. Because the airports were entirely in the dark when they received badging inquiries from K2, airport personnel frequently asked why the USPS/USPIS had not informed them of the change in contractors and routinely instructed Ms. Storey to request that USPIS representatives contact them directly to validate that K2 was indeed a contractor and/or to expedite the badging process. The USPIS's failure to provide notice to cargo warehouse and airport authorities that it had changed screening contractors prior to the start of K2's performance, a task that would have taken less than five minutes per airport, in and of itself made the badging process infinitely more time consuming and arduous.

61.    While awaiting critical information, which the USPS was required to disclose by virtue of its superior knowledge, but which never came, K2 completed USPIS-specific

---

[19] *See* email correspondence from November 2022 and January 2023 between Justin Falconer and Linda Flynn. A true and correct copy of this email correspondence is attached hereto as **Exhibit 15**.

fingerprinting and background checks for personnel slated to service all locations within the Central East Cluster and began conducting extensive internal planning and open-source research in an effort to mitigate any performance delays caused by the USPS's refusal to cooperate.

### 4.    The USPS's Botched Contract Roll Out of the Central East Cluster

62.    In early December 2022, three months after contract award, K2 was still awaiting sponsorship letters from the USPIS, leading to growing concerns regarding government-caused badging delays, which would almost inevitably delay the start of performance. Given this, and against the UPSIS's instructions not to contact airport personnel until after the start of performance, K2 reached out to Brian Olcott, American Airlines' Regional Cargo Manager overseeing cargo operations at the Pittsburgh International Airport ("PIT").

63.    On December 14, 2022, Mr. Olcott delivered surprising news: PIT authorized sponsorships by airport tenants only and the USPS did not have an active entity on site.[20] Fortunately for the USPS, American Airlines agreed to act as K2's sponsor – even though it had no contract with K2 and assumed potential liability in doing so as a result. This undertaking on the part of American Airlines was the sole reason K2's handlers were able to get badged and support the timely roll out of services at PIT.

64.    Cleveland Hopkins International Airport ("CLE") was scheduled to follow PIT with a roll-out date of February 22, 2023. While the updated roll-out schedule in Amendment 004 removed the only airline to be serviced at CLE, it was not until months after the fact that the USPIS verbally informed K2 that *all* services at CLE were cancelled. The USPS contracting office,

---

[20] *See* email correspondence dated December 14, 2022, from Mr. Olcott to K2. A true and correct copy of this email correspondence is attached hereto as **Exhibit 16**.

however, never issued a written modification to actually delete CLE and cancel all services at that location.

65.     John Glenn Columbus International Airport ("CMH") was next in line, with a scheduled start date of March 1, 2023. K2 submitted the sponsorship letter provided by the USPIS, only to have it rejected outright by the airport authority. Specifically, Amy White at the CMH credentialling office informed K2 that the USPIS sponsorship letter was unlike any letter they had received, and that the USPS does not work with CMH.[21] K2 subsequently discovered that, like PIT, the USPS was not maintaining an on-site entity at CMH.

66.     K2 continued to proceed at CMH with zero operational or contractual support from the USPS and eventually connected with Donna Goetz, the Corporate Security Manager for GAT Airline Ground Support at CMH. Ms. Goetz suggested that the USPS contact CMH badging to "request that the two handlers' prints be taken and faxed to CMH by local NC law enforcement" to expedite matters and allow GAT personnel to escort K2 personnel while their badges were processed.[22]

67.     Despite the USPS's failure to notify the airport authorities of a change in screening contractors, failure to cooperate and provide K2 with information vital to the performance of the Contract, and failure to timely engage and assist with badging issues that were the direct result of the USPS's inaction, K2, through its own initiative, ultimately rolled out CMH on schedule.

68.     In the weeks that followed, K2 learned that the USPS either did not maintain on-site entities or had vacated tenancies at airports where it previously had an on-site presence.

---

[21] *See* email correspondence dated February 21, 2023, between Charity Storey and Landen Hawkins. A true and correct copy of this email correspondence is attached hereto as **Exhibit 17**.

[22] *See* email correspondence dated February 22, 2023, from Donna Goetz to Charity Storey. A true and correct copy of this email correspondence is attached hereto as **Exhibit 18**.

69.     Ultimately, K2 discovered that the USPS did not have an on-site entity at a single airport within the Central East Cluster.

70.     Without an on-site entity, the sponsorship letters issued by the USPIS were useless – a fact that the USPS withheld from K2.

71.     The USPS's decision not to maintain on-site entities at airports to which mail was being delivered for screening – a change that the USPS never disclosed to K2 – created a litany of problems that K2 was forced to navigate without any assistance from the COR or the Contracting Office.

**5.      The USPS's Botched Roll Out of the Northwest Cluster**

72.     The Northwest Cluster, which was comprised of airport sites in Portland ("PDX"); Oakland ("OAK"); Sacramento ("SMF"); Salt Lake City ("SLC"); San Francisco ("SFO"); Seattle ("SEA"); and Anchorage ("ANC"), was scheduled to roll-out on April 26, 2023.

73.     Badging issues arose well before K2 began performing at PDX, the first site scheduled to roll out.

74.     To start, the USPIS failed to provide contact information for airport authority/USPIS on-site personnel until April 14, 2023, which was a Friday afternoon, giving K2 just eight business days to get required badging. When K2 reached out to the local USPIS point of contact provided by the COR, Cesar Lopez, he informed K2 that he was not the person responsible for assisting with sponsorship and badging on behalf of the USPS, and that Larry Peck was the USPS representative listed with the Port Authority as the Authorized Signatory Representative.

75.     In the weeks that followed, Mr. Falconer and Ms. Storey sent numerous emails to Mr. Peck requesting assistance with badging, as he was the person that both on-site USPIS personnel and PDX airport authority personnel identified as responsible for facilitation. The

correspondence between Mr. Falconer, Ms. Storey, and Mr. Peck on this subject speaks for itself and evidences K2's efforts to comply with its obligations under the Contract and the USPS's continued frustration of the same.[23]

76.    During the first month of performance, K2 continued to request status updates from both Mr. Peck and the Port Authority regarding the status of K2's badging.

77.    Mr. Peck responded to these requests by stating that he was waiting for information from the Port Authority, whereas the Port Authority repeatedly stated it had not received the information it required to move forward from Mr. Peck.

78.    A few days into Contract performance, Mr. Peck went on vacation. K2 was not given any updates before his departure or during his absence.

79.    Mr. Peck returned from vacation on May 15, 2023, and when K2 requested a status update on badging, he had no further information to provide.

80.    Ultimately, K2 was unable to get badged before starting performance, and the assigned handler had to be escorted at all times during screening while K2 continued to wait for Mr. Peck (whose position at the USPS/USPIS remains a mystery to this day) to facilitate badging.

81.    On May 23, 2023, Mr. Falconer attended a virtual meeting set up by PDX Port Authority. During this meeting, Mike Badin, Specialist, Aviation Security Operations for PDX, stated that the Port Authority had reached out to the USPIS personnel on multiple occasions in an effort to understand K2's purpose at the Port and the nature of the services that K2 was contracted to perform, but received no response from the USPIS.

---

[23] *See* email correspondence dated April 17, 2023, through April 21, 2023, between Mr. Falconer, Ms. Storey, and Mr. Peck. A true and correct copy of this email correspondence is attached hereto as **Exhibit 19**.

82.     Over the course of the conversation, Mr. Falconer learned that PDX Port Authority was entirely unaware K2 was actively performing explosives screening services at the airport and had been doing so for nearly a month. Mr. Badin was alarmed by this information, and the next day K2 received notification that all screening operations at PDX were shut down until further notice.

83.     The following week, PDX Port Authority set up a meeting and invited stakeholders from the USPIS, TSA, PDX, and K2. During that call, representatives from the Port Authority reiterated the absence of any communication from the USPIS regarding the services K2 was contracted by USPS to perform.

84.     A PDX representative went so far as to state that had PDX been informed of the change in contractors (from MSA to K2), they would have worked with K2 to ensure personnel had the proper badging well in advance of the intended roll-out date. As mentioned in a May 30, 2023, email from Ms. Whitt to Mr. Jacobs and to Edward Moore, the USPS Contracting Officer, no one at the Port Authority was given advance notice of K2's status as a contractor.

85.     Worse, for the first several weeks that K2 was conducting screening, PDX officials were under the impression that K2 was conducting sweeps for ***illicit substances rather than explosives***.

86.     It was only when PDX officials learned K2 was on property to conduct explosives screening that they stopped the escort process and effectively stopped the work until the nature of K2's services under its contract with the USPS were clarified and the process for proper badging could begin.[24]

---

[24] See email correspondence between K2, the USPS, and PDX from May 2, 2023, through May 25, 2023. A true and correct copy of this email correspondence is attached hereto as **Exhibit 20**.

87. This meeting was the catalyst for the commencement of the badging process at PDX.

88. PDX lifted the stop-work order and badging was obtained by K2's handler approximately five days after he was allowed to start the process.

89. If the USPIS had simply notified the Port Authority about the change in contractors and provided K2 with accurate and timely point of contact information for badging at PDX, both of which it was required to do, this fiasco would have been avoided entirely.

90. K2 repeatedly requested that the USPIS send accurate and updated contact information, which it had an obligation to provide, and raised the USPIS's repeated refusal to do so with the USPS contracting office on numerous occasions.[25]

91. Instead of assisting, both the contracting office and the inspection service refused to acknowledge the fact that their abject failure to plan or coordinate with K2 on any part of the roll-out was the root cause of the badging issues K2 was experiencing and refused to undertake any action to fix the problem.

92. Moreover, the USPS contracting office had the gall to categorize K2's inability to obtain badges before performance commencement – a USPS/USPIS-driven problem – as a "performance deficiency" in the entirely pretextual Corrective Action Demand it issued on July 7, 2023, months after K2 had resolved the issues that the USPS created.

93. The USPIS also botched the transition of services to K2 at SEA. The SEA Port Authority was only marginally less confused by K2's presence than cognizant port personnel at

---

[25] *See* email correspondence dated May and June 2023 between Meghan Whitt and Russell Jacobs. A true and correct copy of this email correspondence is attached hereto as **Exhibit 21**.

PDX, and Daronda Lowe, the on-site USPS employee listed as USPS's designated Authorized Signatory, was fully unaware of the change in contractors.

94.     When K2 sent the USPS-generated "sponsorship letter" to Ms. Lowe, she responded stating: "Is this a new supplier? Because I have Port of Seattle Company Agreement for (Michael Stapleton Associates, LTD, dba MSA Security) that expires in November 2024."[26]

95.     A representative from the SEA Credential Center, who was copied on Ms. Lowe's email chain, stated, "[i]t's not up to us who signs for a company. It could be USPS or the Port of Seattle, whoever K2 is doing work for that requires a badge."[27]

96.     The issues that confronted K2 at PDX and SEA were extensive and typified those K2 faced in the vast majority of locations where it was contracted to provide services.

97.     Despite the obstacles imposed by the USPS, K2 rolled out the remaining Northwest Cluster sites between April and June 2023 in accordance with the schedule, with the exception of SFO.

98.     K2 was unable to roll-out SFO as scheduled (and ultimately, not at all) because the SFO Port Authority required that the USPS maintain an entity on-site to sponsor new contractors providing on-site services.[28] The USPS failed to maintain an on-site entity, preventing K2 from providing services at all SFO duty sites and instead continuing to utilize MSA in direct contravention of the Court of Federal Claims' December 2023 Order.

---

[26] *See* email correspondence dated May 16, 2023, through May 18, 2023, between K2 and the USPS.  A true and correct copy of this email correspondence is attached hereto as **Exhibit 22**.

[27] *Id.*

[28] *See* email correspondence dated May 8, 2023, from Justin Falconer to the USPIS. A true and correct copy of this email correspondence is attached hereto as **Exhibit 23**.

99.     The USPS cited K2's inability to obtain badging at SFO, an issue that was caused entirely by the USPS, as the basis for issuing a unilateral contract modification delaying transition of the entire Southwest Cluster from MSA to K2 by several months. Modification 009 was issued on July 10, 2023, one business day after the Corrective Action Demand, demonstrating the fiction of the Demand itself and spotlighting the USPS's thinly veiled agenda to keep MSA in place as long as possible.

100.    A false narrative of the badging issues discussed above was included in the USPS's Corrective Action Demand. Cited as "performance issues," the USPS asserted that K2 failed to obtain SIDA badges at ANC and PDX and claimed that the transition of work to K2 at SFO "had to be rescheduled to mid-November 2023 due to K2's failure to obtain SIDA badging and customs seals in a timely manner before the start-up date."[29]

101.    Notably, each of the foregoing "performance issues" was omitted from the USPS's Termination Notice. The Termination Notice incorporates and repeats, as if nothing had changed, the entirety of the ***already resolved*** issues listed in the Corrective Action Demand and Cure Notice, ***save these three***. These incidents were intentionally omitted by the USPS in its Termination Notice, even though the Termination Notice purported to include all the issues in the Corrective Action Demand and Cure Notice as bases for defaulting K2.

102.    The USPS's intentional and conspicuous omission of these three alleged deficiencies from the Termination Notice underscores the pretextual nature of the termination. There is only one reason for this omission, and it is plain: the USPS itself caused every single badging-related problem. These were issues against which the USPS could not have defended as

---

[29] *See* K2's Demand for Corrective Action Plan dated July 7, 2023. A true and correct copy of the Demand for Corrective Action Plan is attached hereto as **Exhibit 24**.

being caused by anything other than its own failures, demonstrating the lengths it undertook to formulate its baseless termination of K2.

103.    The USPS did not raise a single issue or concern following K2's Corrective Action Demand response of July 14, 2023. Yet, on August 23, 2023, without reason or notice, the USPS issued unilateral Modification 010, changing the status of transition at SFO (in the Northwest Cluster) as well as all sites within the Southwest Cluster from "delayed" to "indefinitely suspended." Mod 010 also suspended transition of the Central North Cluster from MSA to K2 indefinitely.

104.    The USPS provided no rationale for delaying and ultimately suspending the transition of services in the Southwest and Central North Clusters from MSA to K2, even after K2 requested that it do so. The USPS had no legitimate justification for issuing Modifications 009 and 010, and it is clear that those modifications were solely in furtherance of the USPS's desire to continue working with MSA, which it did, boldly flouting the order and injunction issued by the Court of Federal Claims seven months prior.

C.    **The USPS's Pretextual and Bad Faith Termination of K2's Contract**

1.    **The USPS's Allegations that K2 Failed to Comply with Contract Requirements Are Baseless and Unsubstantiated**

105.    The USPS issued the Termination Notice on January 24, 2024. In it, the USPS alleged that the purported deficiencies set forth in its July 7, 2023, Corrective Action Demand and

September 6, 2023, Cure Notice, as well as new issues raised for the very first time in the Termination Notice, constitute sufficient grounds to justify its termination for default.[30]

106.    Although the USPS issued a Corrective Action Demand and subsequent Cure Notice (both of which were themselves baseless and unwarranted), it accepted K2's response without further concerns and raised no issues regarding K2's subsequent performance until the Termination Notice itself. Thus, none of the USPS's termination allegations have merit.

107.    The USPS's asserted "deficiencies" fall into three categories: (1) the Inverted V explosives screening technique, (2) staffing, and (3) contract compliance.

108.    The USPS used the third category as a catch-all for any alleged "deficiency" that did not squarely fit into the other two categories. But the USPS's generic and fictional assertions regarding K2's alleged performance deficiencies are both scant and untethered to the requirements of the Contract.

109.    In the Termination Notice, the USPS asserted "a continued inability of K2 to satisfy the requirements of the Contract." Yet, between the "deficiencies" alleged in the Corrective Action Demand and those in the Cure Notice, the only contract compliance issue cited was as follows: "During a field visit to the ORD ISC, K2 did not have sustainment odor setup as required. The K2 storage cabinet, containing the odor was locked and there was no available key on site."[31]

110.    There is no basis for this purported deficiency. First, the incident was listed as having occurred on March 22, 2023, but K2 did not begin screening at ORD until April 12, 2023. Second, there are no requirements or protocols for sustainment odor storage and setup in the Contract.

---

[30] *See* the USPS's Termination Notice dated January 24, 2024, at 3. A true and correct copy of the Termination Notice is attached as **Exhibit 25**.

[31] *Id.* at 1; Ex. 24 at 1.

111.    The USPS attempted to bolster its claims of contractual non-compliance in the Termination Notice with several new allegations, none of which it had notified K2 about in the months between the USPS's acceptance of K2's Cure Notice Response and the Contract termination.

112.    The USPS alleged, for the first time in the Termination Notice, that on November 7, 2023, "K2 did not have a fan in place at a canine's kennel and did not screen according to the required schedule for Delta airlines."[32] These allegations are unfounded. First, canines do not need, nor would they benefit from a kennel fan in Seattle in the month of November. More importantly, having a kennel fan in place is not a contract requirement. Second, if K2 had failed to screen in accordance with the schedule, the USPS would have notified K2 immediately and liquidated damages would have been assessed in accordance with the Contract. Neither occurred.

113.    The USPS alleged that on November 8, 2023, "an audit at United Airlines revealed that K2: (i) did not screen according to the required schedule; (ii) was not complying with the inverted V sniff pattern; (iii) did not lock the file cabinet; and (iv) did not have a copy of the playbook." These claims are untrue. If K2 had not screened according to the required schedule, the USPS would have notified K2 immediately and liquidated damages would have been assessed in accordance with the Contract. Neither occurred. If K2 had failed to comply with the Inverted V sniff pattern, the USPS would have notified K2 in writing of this failure; it did not. Allegations (iii) and (iv) are baseless, frivolous and are not tied to any requirement under the Contract or to the Statement of Work.

114.    The USPS alleged further that on November 8, 2023, "an audit at Alaska Airlines revealed that K2: (i) did not have a sustainment bag tracker, and (ii) did not screen according to

---

[32] *See* Ex. 25 at 3.

the required schedule." Both contentions are groundless, and had K2 failed to screen in accordance with the schedule, the USPS would have notified K2 immediately and liquidated damages would have been assessed. Neither occurred.

115.    The USPS alleged that on November 24, 2023, K2's handler did not follow the instructions regarding the time to begin screening. As discussed above, if K2 had not complied with the screening schedule, the USPS would have notified K2 immediately and liquidated damages would have been assessed pursuant to the Contract. Neither occurred.

116.    The USPS alleged that between December 30, 2023, and January 2, 2024, K2 personnel violated JFK International Service Center policy by covering windows to the office where K2 personnel were stationed, and that K2 did not timely respond to instructions to remove the covering. The windows in question were covered by K2's on-site Team Lead. This decision was made after repeated complaints by K2 female handlers who reported that the USPS warehouse workers stared at them and made them feel uncomfortable for the duration of their shift. JFK warehouse personnel notified the USPS that window coverings violated the warehouse policy and the coverings were removed by K2 personnel upon return to work (within a matter of days following notification). The window coverings had no impact on screening or K2's ability to discharge its duties under the Contract, nor does the USPS argue as much.

117.    The USPS argues that K2 failed to comply with contract requirements and points to three unilaterally issued documents in support of this contention: the Corrective Action Demand, the Cure Notice, and the Termination Notice. Yet, none of the three references a single act or omission by K2 that can be tied to a legitimate, stated contract requirement. The USPS did not cite any actual compliance failures on the part of K2 because there were none.

### 2.    The USPS's "Inverted V" Allegations Are False

118.    The USPIS required K2 to use a search method known as the "Inverted V" as the exclusive search technique when conducting operational screening. The Inverted V is a directed search technique whereby the handler removes autonomy from the K9 with repetitive directions and assumes that the handler's direction is more important than the dog's hunt drive and nose. It is no longer in practice as a preferred, much less an exclusive, search technique by all federal agencies and research institutions. Nevertheless, in accordance with the one time it is mentioned in the Statement of Work, K2 mandated that all its handlers conduct screening operations with the exclusive use of the Inverted V screening approach.

119.    However, in accordance with its contractual obligation to research and offer "new techniques for safer and more efficient ways to screen mail for the presence of explosives," K2 raised concerns regarding the exclusive use of the Inverted V screening method shortly after Contract award.

120.    Specifically, Mr. Kjellsen, as required by the Contract, raised concerns regarding the exclusive use of the Inverted V with the COR and the USPIS team before performance, during the USPS's September 2022 site visit.

121.    At that time, the USPIS Team indicated an interest in learning more about K2's concerns, and on April 11, 2023, at the request of the USPIS, K2 demonstrated the advantages and overall efficacy of utilizing the advanced screening techniques adopted by all branches of the Armed Forces and all facets of the Federal Government – to include the TSA – over the largely abandoned and obsolete Inverted V method.

122.    During the demonstration, USPIS personnel, including Mr. Blair and Ms. Flynn, verbally agreed that the independent hunt approach discussed and demonstrated was sound, leading K2 leadership to believe that a contract modification would be issued in short order.

123.    In the weeks and months that followed the demonstration, K2 regularly emailed the contracting office, and engaged in several discussions with Mr. Jacobs and Mr. Moore regarding the status of the anticipated modification. And, at the request of the USPS contracting office, K2 even submitted a white paper on the subject.

124.    Between September 2022 and June 2023, there was not a single instance in which the USPS indicated it had no intention of modifying the Inverted V requirement, and in fact, all correspondence from the USPS contracting office indicated that it was simply running the matter to ground.

125.    Notwithstanding its concerns, K2 conducted screening as contractually mandated, utilizing the Inverted V technique at all times.

126.    On June 27, 2023, eight months after Contract award but a mere seven days before the USPS issued its Corrective Action Demand, Mr. Jacobs sent an email formally denying K2's request to modify the screening technique requirement stating, "I did speak with the COR on the inverted V situation, as they hold that that method is the best for our purposes and they do not want to change the process. As they are the subject matter expert here, I have to defer to their judgment."[33]

---

[33] *See* email correspondence dated June 23, 2023, through June 27, 2023 from Russell Jacobs to Meghan Whitt. A true and correct copy of this email correspondence is attached hereto as **Exhibit 26**.

127.     Despite the fact that K2 exclusively used the Inverted V technique as mandated, the USPS Termination Notice states, "K2 repeatedly expressed an inability to comply with the inverted V screening process, which is the process required under the Contract."[34]

128.     The USPS's allegation is a lie. K2 ***never expressed an inability*** to comply with the Inverted V screening process.

129.     Worse,    the    USPS's    allegation    as    stated    in    the Termination Notice was designed to be intentionally misleading. While the statement, "K2 expressed an inability to comply with the inverted V screening process," was communicated in such a way as to appear to be a cut and paste from the original Corrective Action Demand (like the other 10 purported "deficiencies" cited from that document), it is a drastic departure from the language used in the original letter.

130.     The Corrective Action Demand described the above-referenced "deficiency" as follows: "***K2 reported issues with the Inverted V screening process***, which is the process required under the Contract." (Emphasis added).[35]

131.     To be clear, the first table of "deficiencies" included in the Termination Notice was a direct copy and paste of the table of deficiencies included in the Corrective Action Demand, except, conspicuously, with respect to the Inverted V.

132.     The USPS's intentional and express attempt to falsely advertise K2's "deficiencies" in the Termination Notice as being worse than what the USPS itself originally asserted is proof of its bad faith.

---

[34] Ex. 25 at 2.

[35] Ex. 24 at 2.

3.    **The USPS's Staffing Allegations Are Made in Bad Faith Considering K2's Highly Successful Screening Levels**

133.    The USPS alleged that K2 failed to adequately staff its service locations resulting in delays in mail screening; however, the uncontroverted performance statistics dispose of this claim.

134.    As discussed, K2 was awarded the Contract in September 2022 and was wrongfully terminated in January 2024.

135.    The International Cluster was the first cluster scheduled to roll out. The Contract required roll-out within five weeks of award, setting K2's performance start date in early October.

136.    Due to the USPS's decision to re-sequence the International Cluster in Amendment 001, moving it from first to last to allow MSA eight more months of performance in direct contravention of the Court of Federal Claims' Order, K2 did not actually begin performing until February 2023.

137.    Between February 2023 and July 15, 2023, K2's deadline for responding to the USPS's Corrective Action Demand, K2 completed 16,335.17 shift hours at 16 different airports across the country from Pittsburgh to Anchorage and Portland to Miami. During that period, K2 maintained a staffing level and on-time screening rate of 99.876%.

138.    Between July 7, 2023, the date of the Corrective Action Demand, and September 6, 2023, the date of the Cure Notice that cited "staffing concerns" as a basis for its issuance, K2 maintained a staffing level and on-time screening rate of 99.95%.

139.    Between September 6, 2023 and January 24, 2024, the date the USPS terminated K2 for default, K2 maintained a staffing level and on-time screening rate of 99.95%.

140.    The USPS's Termination Notice was accompanied by a "roll off" schedule, with which K2 was required to comply.

141.    Despite the USPS's allegations regarding staffing and K2's performance overall, the mandated roll-off schedule required K2 to continue providing services at multiple locations for *four months following* termination.

142.    K2 continued to perform all services at all scheduled locations in accordance with the roll-off schedule. K2 maintained a staffing level and screening rate of 100% following termination.

143.    Incidents of late or missed shifts by K2 were certainly *de minimis*, and the vast majority occurred in the first few months of performance during the height of roll-out. Moreover, and importantly, these incidents were tied, either directly or indirectly, to the USPS's outright refusal to coordinate or cooperate with K2, including rejecting dozens of requests by K2 for a kick-off meeting and to conduct pre-performance site visits.

144.    Accordingly, the USPS's contention that termination for default was warranted because K2 inadequately staffed certain job sites and missed shifts is demonstrably false.

> **4.    The USPS's Termination of K2 Was Pretextual Because Any Contract Performance Issues Were the Result of the USPS's Own Failures**

145.    The USPS intentionally and increasingly subverted K2's purpose and performance through its willful incompetence and flagrant, wholesale mismanagement of the Contract.

146.    The USPS refused to disclose material facts and information, of which it had superior knowledge, in breach of its contract with K2.

147.    The USPS deliberately abandoned its own exiguous responsibilities, including its obligations: (1) to define, monitor, and assess activities and deliverables; (2) to review and formally approve deliverables; (3) to provide clarification on business requirements and technical design issues; (4) to review and approve project plans and proposed technical solutions; (5) to

provide an acceptance/rejection notice for deliverables; and (6) to determine when and where meetings will be held.

148.    The USPS never defined, monitored or assessed K2's deliverables. It did not even acknowledge K2's deliverables, let alone approve or disapprove them. The USPS refused to provide clarification on scheduling requirements; instead, the COR made near constant scheduling changes on an *ad hoc* basis with little advance notice to K2. The USPS never approved, and to K2's knowledge, never reviewed K2's Staffing Plan or its Task Order Management Plan, which detailed project plans and proposed solutions. The USPS never provided an acceptance or rejection notice to K2 for any of the deliverables K2 submitted. The USPS refused to hold regular or timely meetings with K2 from the outset of Contract performance, despite K2's constant requests and regularly ignored emails and phone calls from K2. The USPS acted in bad faith in its administration of the Contract from award through termination.

149.    The USPS breached its implied duties as well as its express contractual obligations and abused its power at every opportunity, to include submitting manufactured, misleading and wholly irrelevant claims regarding K2's ***current contract performance*** to the Court of Federal Claims and K2's three biggest competitors in a bid protest proceeding to which K2 was not a party.

## COUNT I
(Bad Faith – Breach of Contract)

150.    K2 hereby incorporates the allegations contained in the foregoing Paragraphs 1-149 as if fully set forth herein.

151.    A termination for default is a drastic sanction that should be used only as a measure of last resort. The USPS bears the difficult burden of proving that a termination for default is justified.

152.    Not every departure or minor deviation from the literal terms of a contract are sufficient to support a finding of default. Indeed, minor deviations or technicalities are insufficient to support a finding of default. Rather, the context of a contractor's performance must be viewed holistically to determine whether default is warranted. A contract may not be terminated where the contractor has near perfect performance levels and meets all contract requirements.

153.    Accordingly, where the government alleges default as a pretext for terminating a contract for reasons unrelated to a contractor's performance, it will have acted in bad faith because its actions cannot be explained as anything other than an improper motive and scheme to injure and remove the contractor through improper means. A bad faith default termination entitles the contractor to contract breach damages.

154.    The USPS terminated the Contract in bad faith. At all times, K2 successfully performed its obligations under the Contract and maintained an exceptional on-time screening rate across all locations throughout the duration of performance. The USPS's termination for default decision does not deny or refute these metrics and fails to identify any other grounds that would suggest, much less justify, a default of K2.

155.    Indeed, in its Termination Notice, the USPS not only recycled allegations that were either unsubstantiated, unrelated to contract requirements, or were long resolved by the parties, it selectively omitted those instances where the USPS was at fault (i.e., the government-caused roll-out delays due to, among other things, the USPS's (i) failure to maintain appropriate on-site airport entities; (ii) failure to provide information required for K2 to obtain badging in a timely manner; (iii) failure to notify cognizant port and airport authorities of its contract with K2 and the type services K2 would be performing on site; and (iv) failure inform cognizant port and airport authorities and airlines of a change in vendors from MSA to K2), and carefully altering the

language describing others to create the illusion that K2 was in breach (i.e., alleging that K2 could not or refused to comply with the Inverted V screening approach when K2 complied with the technique 100% of the time and was simply performing its other contractual obligation to advise the USPS of the problems observed and to offer proactive recommendations for improvement).

156.    The USPS's improper conduct in attempting to justify a plainly illegitimate termination of K2 for default was intentional and designed to harm K2.

157.    For example, the USPS's Termination Notice purports to default K2 based on ***all*** the allegations in the Corrective Action Demand and Cure Notice, but the USPS intentionally omitted from the Termination Notice alleged performance issues at ANC, PDX and SFO that were cited in the Corrective Action Demand. This is because the allegations were either completely false or were caused entirely by USPS's actions/failures – points that K2 made abundantly clear in its Response to the Corrective Action Demand.[36] The USPS's attempt to mask its own errors while shifting all blame to K2 is simply an attempt to malign K2.

158.    Likewise, with respect to Inverted V screening, the Termination Notice, referencing the Cure Notice, states that "K2 repeatedly expressed an inability to comply with the inverted V screening process." However, the Cure Notice had noticeably different language, stating that K2 had simply "reported issues with the inverted V screening process" pursuant to Contract requirements. The USPS's allegations in light of circumstances where K2 was merely complying with its contractual obligations to inform and advise the USPS of issues with the Inverted V approach and recommend alternative screening techniques were, therefore, a lie. The USPS's

---

[36] A true and correct copy of K2's Response to Demand for Corrective Action Plan and Notice of Rollout Postponement is attached hereto as **Exhibit 27**.

alteration of the language in the Termination Notice is an intentional manipulation of the facts and demonstrates bad faith.

159.    Finally, and egregiously, the USPS claimed that a "continued inability of K2 to satisfy the requirements of the Contract" warranted default, but cited issues that were neither substantiated, communicated, nor actual requirements of the Contract.

   a.   The alleged lack of a sustainment odor setup at ORD airport ***pre-dated*** K2's performance at that location, and in any event, was not a Contract requirement;

   b.    The alleged lack of a fan in the kennel area at SEA airport was not a Contract requirement, nor were the alleged lack of a locked file cabinet, playbook, or sustainment bag tracker at PDX airport, or the very limited three-day window covering at JFK airport in response to USPS workers' harassment of K2's female employees Contract requirements; and

   c.   The alleged failures to screen mail in accordance with the schedules for Delta, United, and Alaska airlines are entirely unsubstantiated, issues about which K2 was never notified, and, in any event, clearly had no impact on the mail schedule as no delays or liquated damages were ever assessed against K2 for these purported issues.[37]

160.    The USPS's willingness to fabricate reasons that had no basis in contract or reality in order to terminate K2 for default demonstrates that the termination was wholly pretextual and made in bad faith. First, it was necessarily unrelated to K2's performance, given K2's exceptional

---

[37] Indeed, the USPS's allegations are completely inconsistent with the exceptional performance by K2 as evidenced by the fact that although K2 never had contracts with Delta or United Airlines, Alaska Airlines, with whom K2 has a contract, continues to use K2 to this day, which obviously would not be the case if the performance deficiencies alleged by the USPS were even remotely correct.

on-time screening rate. Second, the undisputed fact that the USPS retained K2 to provide services for four additional months following the Termination Notice confirms the default was a calculated contrivance.

161.   While there was no shortage of management failures and general ineptitude in the USPS's administration of the Contract, that excuse only goes so far. Here, there were numerous actions undertaken by the USPS that cannot be chalked up to mere incompetence. Altering the language that was used in the Cure Notice to insinuate that K2 breached its performance obligations was an intentional act that cannot be excused by a claim of incompetence. Omitting allegations that were included in the Corrective Action Demand because they were either untrue or caused by the USPS was an intentional act that cannot be blamed on incompetence. Giving K2's three biggest competitors, including MSA, false information about K2's contract performance in real time during a bid protest, where such information is wholly and completely irrelevant and serves no legitimate purpose, was an intentional act that cannot be dismissed as mere apathy. These deliberate acts of subversion demonstrate the USPS's bad faith decision to terminate K2 for default in an effort to continue to use MSA, its favored contractor, and to avoid having to pay settlement costs under a proper convenience termination.

162.   The USPS's actions substantially harmed K2's reputation, a critical asset of any government contractor in the highly competitive canine explosives detection industry, and significantly diminished the company's business value. Indeed, the fact that the USPS improperly disclosed false allegations about K2's performance under the Contract to K2's largest competitors confirms this fact, and K2's competitors have since used that information to defame K2 before customers and tarnish K2's reputation in the marketplace.

163.    The USPS's intentional and reckless disregard for the highly prejudicial consequences of its actions to K2's reputation amounted to a specific intent to injure K2 and constitutes bad faith.

164.    As a direct and proximate result of the USPS's bad faith conduct, K2 suffered significant monetary harm and is entitled to damages in an amount to be proved at trial.

## COUNT II
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

165.    K2 hereby incorporates the allegations contained in the foregoing Paragraphs 1-164 as if fully set forth herein.

166.    Inherent in every contract is the duty of good faith and fair dealing. This duty, which applies to the United States, requires the USPS to cooperate and not hinder or interfere with a contractor's performance of its contract with the USPS.

167.    K2 was entitled to every expectation that the USPS would cooperate, not interfere with K2's performance of the Contract, and certainly not act to destroy K2's reasonable opportunity to realize the fruits of its labor under the Contract.

168.    The USPS breached its duties to K2. Rather than being a prudent partner, the USPS, from the outset of contract performance, acted in patently unreasonable ways, including but not limited to:

  d.  Refusing to hold a contract kick-off meeting with K2 and ultimately failing to hold ***any*** kick-off meeting with K2;

  e.  Rejecting K2's numerous requests to conduct ***any*** pre-performance site visits;

  f.  Allowing K2 to needlessly expend resources on ramp up efforts for the International Cluster – the largest and most complicated requirement – while knowing that the USPS would arbitrarily re-sequence it from the first to last cluster

to be rolled out under the program without explanation or even any reasonable, advance notice to K2 of this massive schedule change in frustration of K2's efforts to ramp up staffing in an efficient and effective manner;

g.  Providing unreasonably short, often last-minute, notices regarding licensing, badging and start dates after arbitrarily reshuffling the cluster rollout order;

h.  Absconding its obligations to maintain an on-site entity presence at airports as required to sponsor, obtain and meet airport badging requirements, including those required for SIDA badging, for K2 and otherwise failing to properly sponsor K2 for airport badging requirements;

i.  Failing to advise port and airport authorities, airline customers, and other stakeholders as to K2's identity and that K2 would be replacing MSA as the explosives mail screener at the relevant airport locations;

j.  Failing to provide K2 with the correct point of contact information, and on numerous occasions any information, for cognizant port and airport authorities when K2 attempted to resolve the government-caused badging delays and failures on its own initiative where the USPS: (1) failed to sponsor or provide proper sponsorship for K2, (2) failed to provide correct or timely information to K2 and other stakeholders required to meet badging requirements, and/or (3) provided incorrect information to port and airport authorities and stakeholders about K2's role at those locations, all causing further delays.

k.  Allowing its badging incompetence and errors to delay the start of K2's performance, blaming K2 for these government-caused delays as alleged

"performance deficiencies" or "performance issues," and interfering and distracting K2 from its performance due to these false allegations;

l.  Failing to competently administer the Contract, by among other things, declining or simply failing to respond to K2's questions in a timely or coherent manner and failing or declining to provide any meaningful operational or contractual support;

m.  Failing to enact orderly changes in contract locations by failing to properly descope locations or cancel services pursuant to formal, written modifications as required under the Contract;

n.  Further failing to properly or competently administer the Contract by making (outside of the changes clause or authorized contracting channels) dozens, if not hundreds, of last-minute, constructive changes to K2's handler team sizes and shift schedules;

o.  Repeatedly sending critical, contract-related information to the wrong parties/departments within K2, including, on occasion, to individuals who had retired from K2;

p.  Maligning, hindering, and distracting K2's performance by falsely accusing K2 of refusing to comply with Inverted V screening requirements and claiming that K2 failed to meet requirements that were not even in the Contract; and

q.  Terminating the Contract for default where the issues alleged against K2 were due to government-caused delays and the USPS's gross negligence, errors, and subterfuge in the absence of any basis or justification for the allegations or the termination.

169.    The USPS's pattern of conduct in withholding required information and deliberate subterfuge by biased officials improperly hindered, delayed, and ultimately deprived K2 of the fruits of the Contract by wrongfully terminating K2 and thus breached its implied duty of good faith and fair dealing to K2.

170.    As a direct and proximate result of the breach, K2 suffered substantial monetary harm and is entitled to damages in an amount to be proved at trial.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiff, K2 Solutions, Inc., respectfully requests that this Court:

1.    Enter a declaratory judgment that the USPS's default termination of K2's Contract was made in bad faith, arbitrary and capricious, and must be overturned;

2.    Direct the USPS to rescind the termination for default;

3.    Award K2 damages in an amount to be determined at trial; and

4.    Award K2 its costs of suit, attorney's fees, and any such other relief as to which the Court may deem just and proper.

Dated: January 23, 2025                              Respectfully submitted,


                                        By: /s/ David Yang
                                        David Yang
                                        Timothy M. Hurley
                                        Samuel Amon
                                        Nelson Mullins Riley & Scarborough LLP
                                        101 Constitution Avenue, NW
                                        Suite 900
                                        Washington, DC 20001
                                        (202) 689-2874 (Telephone)
                                        (202) 689-2860 (Fax)
                                        david.yang@nelsonmullins.com
                                        tim.hurley@nelsonmullins.com
                                        samuel.amon@nelsonmullins.com
                                        *Counsel for K2 Solutions, Inc.*